# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
APR 12 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America<br>v.<br>Carlos Jauregui<br><br>*Defendant(s)* | )<br>)<br>)  Case No.<br>)<br>)  3  19  70531  MAG<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  March 23, 2019  in the county of  Sonoma  in the
Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 843(b) | Use of Communication Facility (Telephone) to Commit a Felony Drug Offense<br><br>Maximum Penalties:  4 years imprisonment; $250,000 fine; 1 year supervised release; $100 special assessment; Potential deportation |

This criminal complaint is based on these facts:

See Attached Affidavit of DEA Special Agent Joseph A. Pittaluga

☑ Continued on the attached sheet.

Approved as to form  _____
                      AUSA Rezaei

_____
*Complainant's signature*

Joseph A. Pittaluga, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  April 11, 2019

_____
*Judge's signature*

City and state:  San Francisco, California

Hon. Laurel Beeler, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Joseph A. Pittaluga, being first duly sworn, hereby state as follows:

## I.      INTRODUCTION

1.      I make this affidavit in support of an application for a criminal complaint charging Carlos JAUREGUI with unlawful use of a communication facility, in violation of 21 U.S.C. § 843(b).

2.      The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents related to this investigation, communications with others who have personal knowledge of the events and the circumstances described herein, and information gained through my training and experience.

3.      Because this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation.

## II.     AGENT BACKGROUND

4.      I am a Special Agent of the DEA, where I have worked since August of 2016. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, San Francisco Field Division, Oakland Resident Office. Prior to my employment with the DEA, I was a sworn law enforcement officer with the St. Petersburg Police Department, located in St. Petersburg, Florida, for approximately eleven years. For approximately eight of those years, I was assigned as a detective in the St. Petersburg Police Narcotics Division.

5.      I received twenty weeks of specialized drug law enforcement training at the DEA training academy in Quantico, Virginia, from September of 2016 to February of 2017. The training curriculum covered all aspects of drug investigations, including identification of controlled substances, physical and electronic surveillance, utilization of confidential sources,

1

interview techniques, undercover operations, financial investigations, money laundering techniques, and the general operation of drug trafficking organizations.

6. Over the course of my law enforcement career, I have participated in hundreds of investigations of illicit drug traffickers including complex conspiracies. These investigations have involved the use of undercover officers, confidential informants, physical surveillance, and investigative interviews that have led to the execution of search and arrest warrants at both the state and federal level. I have participated in the execution of hundreds of warrants to search particular places or premises for controlled substances, related paraphernalia, firearms, and other evidence of violations of both state and federal narcotics statutes. I have participated in multiple wire investigations at the state and federal level. I have been actively involved as the case investigator in state and federal investigations and have talked with multiple confidential informants involved in trafficking narcotics. I have been the affiant for both state and federal search warrants related to the investigation of persons involved in narcotics trafficking offenses. My work in these areas has resulted in the arrest of numerous offenders at the state and federal level, the seizure of bulk narcotics, narcotic supplies, and assets. In the course of these investigations, I have acted in an undercover capacity, purchasing crystal methamphetamine, heroin, cocaine base, cocaine powder, prescription medications, MDMA, and marijuana. Moreover, I have participated in, planned, and/or supervised numerous instances of physical surveillance and electronic surveillance. I have conducted interviews of defendants at the time of their arrest, and I have debriefed and interviewed informants and other non-defendants with respect to drug investigations. Specifically, I have interviewed numerous defendants and informants who have participated in methamphetamine and cocaine trafficking by Mexican drug trafficking organizations.

7. As a result of my participation in these and other activities, I have learned about the use and utility of undercover agents, confidential informants, physical surveillance, wire surveillance, electronic surveillance, oral surveillance, consensual recordings, investigative interviews, mail covers, trash searches, installation and monitoring of GPS tracking devices,

pole-mounted cameras, and the execution of federal and state search and arrest warrants. In addition to using the aforementioned investigative techniques, I have been required during these investigations to analyze information resulting from traditional record sources, such as telephone toll and subscriber records, as well as non-traditional record sources, such as the informal ledgers routinely maintained by narcotics traffickers listing amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources. I also have gained expertise in the identification and collection of drug and non-drug evidence, and the analysis and the interpretation of recorded conversations. Additionally, I have spoken extensively with other experienced law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures employed by drug traffickers.

       8.     Through my active involvement in narcotics investigations, discussions with other law enforcement personnel, formalized classroom and field training, discussions with confidential informants, and arrest interviews of defendants involved in the trafficking of controlled substances, I have become familiar with the methods used by drug traffickers to import, transport, safeguard, and distribute drugs, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds. Specifically, I have participated in over five state and federal investigations in which court-authorized wire interceptions were used in narcotics and/or money laundering investigations. The majority of the wiretap investigations I have participated in involve drug trafficking organizations which traffic in cocaine, heroin, and methamphetamine. During these investigations I have reviewed hundreds of line sheets (summaries of intercepted conversations) or transcripts (written verbatim accounts of intercepted conversations) of drug-related conversations. I have confirmed the meaning of the drug-related intercepted conversations with the targets themselves in post-arrest debriefings. I have participated in hundreds of hours of surveillance, observing and recording the movements of persons trafficking in drugs who were targets of wiretap interceptions. As such, I was able to

compare the content of the intercepted conversations with the actual movement and action of the persons intercepted on the wiretap. All of these factors have formed the basis for my opinions.

9. I have participated in the investigation discussed in this affidavit. I am familiar with the facts and circumstances of the investigation through my personal participation in it based on several investigative techniques, including discussions with agents of the DEA and with other law enforcement agencies, discussions with witnesses involved in the investigation, and review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another DEA agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

10. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation in order to obtain the criminal complaint.

### III. APPLICABLE LAW

11. Title 21, United States Code, Section 843(b) makes it unlawful for a person to knowingly and intentionally use a communication facility (such as a telephone) to facilitate the commission of any act or acts constituting a felony under Title 21 of the United States Code.

12. Title 21, United States Code, Section 841, makes it unlawful for a person to manufacture, to possess with intent to distribute, or to distribute controlled substances.

### IV. STATEMENT OF PROBABLE CAUSE

13. On March 18, 2019, agents obtained a federal wiretap order authorizing agents to intercept wire and electronic communications to and from cellphone number 669-800-9943 (**Target Telephone 1**), which I believe was being used by Manuel AVILA-CAMACHO. During

4

the period of interceptions, I overheard and read multiple conversations between **Target Telephone 1** and 707-933-6533. As I describe further below, I believe this phone was being used by Carlos JAUREGUI.

14. On March 23, 2019, **Target Telephone 1** had exchanged the following text messages with 707-933-6533 ("JAUREGUI").

> JAUREGUI: What's up how are you? (1:49 p.m.) (Intercept # 194)
>
> JAUREGUI: How much for half a K of windows (1:49 p.m.) (Intercept # 195)
>
> AVILA-CAMACHO: 2 (2:24 p.m.) (Intercept # 196)
>
> JAUREGUI: Is that the lowest? (2:26 p.m.) (Intercept # 197)
>
> JAUREGUI: A friend gets them for 3500 for the whole one (2:26 p.m.) (Intercept # 198)
>
> AVILA-CAMACHO: Take off a peso (2:27 p.m.) (Intercept # 199)
>
> JAUREGUI: 1900 (2:27 p.m.) (Intercept # 200)
>
> JAUREGUI: Ok, I'll call you during the week, like on Tuesday. (2:28 p.m.) (Intercept # 201)
>
> AVILA-CAMACHO: If you can, I can go over there on Monday (2:30 p.m.) (Intercept # 202)
>
> JAUREGUI: Ok. let me see how I'm doing with money (2:30 p.m.) (Intercept # 203 and # 204)
>
> AVILA-CAMACHO: Alright (2:30 p.m.) (Intercept # 205)
>
> AVILA-CAMACHO: Ok. Hey, why were you not answering me? You had me worried. I thought you had relapsed (2:34 p.m.) (Intercept # 206)
>
> JAUREGUI: No. I feel better now (2:35 p.m.) (Intercept # 207)

15. Based upon my training, experience, and knowledge of this investigation, I believe that JAUREGUI was asking AVILA-CAMACHO for the price of half a kilogram ("half a K") of methamphetamine ("windows"). AVILA-CAMACHO replied, "2," which I believe

5

meant $2,000. From my experience, that price is within the range for the price of half a kilogram of methamphetamine in California at this time. JAUREGUI explained that he could purchase a whole kilogram of methamphetamine for $3,500 from a "friend." JAUREGUI requested a cheaper price. AVILA-CAMACHO stated, "Take off a peso," which I believe meant that AVILA-CAMACHO was willing to sell the half kilogram, or approximately one pound of methamphetamine, for $100 less or $1,900. JAUREGUI confirmed the price and informed AVILA-CAMACHO that he would contact AVILA-CAMACHO when he had the money. Based on the interceptions, JAUREGUI continued to push back the meeting.

16. Later, on April 2, 2019, AVILA-CAMACHO, using **Target Telephone 1**, received a call (Call # 798) from JAUREGUI, who was utilizing 707-933-6553. During the call, JAUREGUI asked AVILA-CAMACHO if they could do the deal on Thursday (which was April 4, 2019). AVILA-CAMACHO told JAUREGUI that he was traveling "that way" "tomorrow" (which was Wednesday, April 3, 2019). JAUREGUI told AVILA-CAMACHO to send JAUREGUI a message in the morning.

17. From approximately 8:27 p.m. to 8:37 p.m., on April 2, 2019, AVILA-CAMACHO (**Target Telephone 1**) had the following text communications with JAUREGUI (707-933-6553):

> JAUREGUI: Can you be here at 10 (8:27 p.m.) (Intercept # 866)
>
> AVILA-CAMACHO: Ok (8:36 p.m.) (Intercept # 867)
>
> JAUREGUI: Thank you (8:36 p.m.) (Intercept # 868)
>
> JAUREGUI: In Sonoma (8:36 p.m.) (Intercept # 869)
>
> JAUREGUI: The half (8:36 p.m.) (Intercept # 870)
>
> AVILA-CAMACHO: Ok. You are welcome (8:37 p.m.) (Intercept # 871)

I believe that during this communication, JAUREGUI was asking AVILA-CAMACHO if he could be in Sonoma, California, at 10:00 a.m., to complete the half kilogram methamphetamine transaction. AVILA-CAMACHO confirmed.

18. On April 3, 2019, the next day, I observed, via electronic surveillance, AVILA-CAMACHO walk out of the garage of his residence in Stockton carrying what appeared to be a dark-colored bag. AVILA-CAMACHO carried the bag to his car and then departed.

19. Between approximately 8:42 a.m. and 10:06 a.m., AVILA-CAMACHO, using **Target Telephone 1**, and JAUREGUI, using telephone number 707-933-6553, exchanged multiple text messages as follows:

>AVILA-CAMACHO: I am just leaving (8:42 a.m.) (Intercept # 901)
>
>JAUREGUI: Ok (8:42 a.m.) (Intercept # 902)
>
>JAUREGUI: How much 1800? (8:42 a.m.) (Intercept # 903)
>
>AVILA-CAMACHO: 20 (10:06 a.m.) (Intercept # 929)
>
>JAUREGUI: Ok (10:06 a.m.) (Intercept # 930)

Based on my training, experience, and knowledge of the investigation, I believe that AVILA-CAMACHO informed JAUREGUI he was on the way to meet with him; JAUREGUI confirmed and asked if the price for the half kilogram of methamphetamine was $1,800. AVILA-CAMACHO informed JAUREGUI that the price was $2,000, which JAUREGUI acknowledged.

20. At approximately 10:39 a.m., Sonoma County Sheriff's Office Detective Dan Ager saw AVILA-CAMACHO's car parked in front of 540 W. Spain Street, Sonoma, California. AVILA-CAMACHO was seen talking with JAUREGUI in the driveway of the residence. AVILA-CAMACHO and JAUREGUI were standing next to JAUREGUI's vehicle, a white GMC truck, bearing California license plate number 49089N1 (the "GMC truck"). A white

Honda 4-door, bearing California license plate number 6YVX299, was parked in front of the residence as well.

21. California license plate number 49089N1 is assigned to a 2008 GMC pick-up truck registered to Carlos JAUREGUI and Maritza BARRIOS at 462 Linda Drive, Sonoma, California. California license plate number 6YVX299 is assigned to a 2007 Honda 4-door registered to Carlos JAUREGUI and Maritza BARRIOS at PO Box 134, Glen Ellen, California.

22. Detective Ager saw AVILA-CAMACHO reposition his car approximately three separate times along W. Spain Street; each time, AVILA-CAMACHO moved his car further away from 540 W. Spain Street. Based upon my training and experience, I believe AVILA-CAMACHO was conducting counter-surveillance in an attempt to see if law enforcement was watching him.

23. Minutes later, Detective Ager saw AVILA-CAMACHO put on a black jacket and open his trunk. AVILA-CAMACHO removed a bag from the trunk and held it under the jacket, much like how a football player carries a football. AVILA-CAMACHO then walked back to 540 W. Spain Street and met with JAUREGUI in the driveway.

24. Detective Crean saw AVILA-CAMACHO walk back to his car carrying an empty dark-colored bag. I believe the dark-colored bag had contained methamphetamine—methamphetamine which AVILA-CAMACHO had given to JAUREGUI in accordance with their earlier communications. AVILA-CAMACHO kept the dark-colored bag.

25. Detective Ager observed JAUREGUI leave 540 W. Spain Street in the GMC truck. As JAUREGUI left, a Sonoma County Sheriff's patrol car, which was not involved with any surveillance, drove by JAUREGUI. JAUREGUI continued to drive along W. Spain Street

and then parked the GMC truck along the curb. JAUREGUI exited the GMC truck while on the phone and began looking around.

26. Detective Ager saw JAUREGUI, who was driving the GMC truck, make a U-turn along W. Spain Street. He then turned onto Linda Drive and parked in the driveway of 462 Linda Drive, Sonoma, California. JAUREGUI exited the GMC truck and stood in the driveway looking around as if he was looking for law enforcement surveillance vehicles. As referenced, 462 Linda Drive, Sonoma, California, is the registered address of the GMC truck and is listed on JAUREGUI's California driver's license.

27. At approximately 11:52 a.m., AVILA-CAMACHO, using **Target Telephone 1**, received a call (Call # 971) from JAUREGUI, who was using telephone number 707-933-6553. During the call, JAUREGUI asked if AVILA-CAMACHO was okay. AVILA-CAMACHO explained that everything was okay. JAUREGUI stated that as soon as he left, a "little car got on him" and he got nervous. (As stated, a patrol car drove by JAUREGUI following his meeting with AVILA-CAMACHO.) JAUREGUI informed AVILA-CAMACHO that he was going to erase all the messages. JAUREGUI directed AVILA-CAMACHO to erase all of his messages as well.

28. Based on my training, experience, and knowledge of the investigation, I believe that AVILA-CAMACHO transported half a kilogram of methamphetamine from his home to 540 W. Spain Street, in Sonoma, California, where he distributed it to JAUREGUI. I further believe that JAUREGUI gave AVILA-CAMACHO $2,000 for the methamphetamine and that JAUREGUI transported the methamphetamine in the GMC truck to 462 Linda Drive. I believe that JAUREGUI pulled the GMC truck to the curb upon seeing the patrol car to avoid being

pulled over for some kind of traffic violation, which might then lead to a seizure of the drugs and an arrest.

29.    In my training and experience, I know that the possession of half a kilogram of methamphetamine—which equates to over one pound—is wholly inconsistent with personal use. Instead, the possession of half a kilogram of methamphetamine is consistent with further distribution. I therefore believe JAUREGUI possessed the methamphetamine with the intent to distribute it.

30.    On April 11, 2019, I and other agents executed federal search warrants at two homes in Sonoma, California, where detectives with the Sonoma County Sheriff's office had seen JAUREGUI. At that time, I seized a cellphone bearing call number 707-933-6553, which is the phone that I believe JAUREGUI used to order drugs from AVILA-CAMACHO.

## V.    **CONCLUSION**

31.    Based upon the information contained within the affidavit, I submit that I have established probable cause to believe that Carlos JAUREGUI has violated 21 U.S.C. § 843(b) by using a cell phone to facilitate the commission a felony under the Controlled Substances Act—specifically, possession with intent to distribute methamphetamine.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Dated:  

_____  
JOSEPH A. PITTALUGA  
Special Agent  
Drug Enforcement Administration

Subscribed and sworn to before me this \_\_11\_\_ day of April, 2019, in San Francisco, California.

_____  
HONORABLE LAUREL BEELER  
United States Magistrate Judge

11